**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
SASQUA GROUP, INC. and
CHRISTOPHER G. TORS,

                           Plaintiffs,

          - against -

LORI COURTNEY and ARTEMIS
CONSULTING, INC.,

                       Defendants.
---------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

CV 10-528 (ADS) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

      This action arises out of a dispute between the owner of Plaintiff Sasqua Group, Inc.

("Sasqua"), namely, Plaintiff Christopher G. Tors ("Tors") (collectively with Sasqua, the

"Plaintiffs"), and an executive who left the company, Defendant Lori Courtney ("Courtney").

The business relationship between the parties is further impacted by the fact that Sasqua's owner,

Tors, is the uncle of the departing executive niece Courtney. This matter was referred to me by

Judge Leonard Wexler, who, acting as the miscellaneous district judge on duty on February 9,

2010, heard argument on Plaintiffs' application for a temporary restraining order, seeking to

prevent Defendants (1) from using, disclosing, or providing access to any of the Plaintiff

company's confidential, propriety and/or trade secret information and (2) contacting or

communicating with Plaintiffs' client contacts. Judge Wexler found the trade secrets issue to be

a "close question," but denied the application, without prejudice, and with the right to renew.

*See* DE 6.

      Having determined that the issue should be decided in the context of a hearing, Judge

Wexler referred the case to me (1) for a hearing on the nature of the information sought to be

protected and (2) to issue a Report and Recommendation as to the propriety of granting a temporary restraining order. *Id*. The hearing on the trade secrets issue was conducted on February 11, 2010. Once this matter was officially opened on ECF, the case was assigned to the Hon. Arthur D. Spatt, to whom this Report and Recommendation is now directed.

## I.   FACTUAL BACKGROUND

Plaintiff Christopher Tors is a resident of Vermont and the president and founder of Sasqua, an executive search consulting firm specializing in the recruitment and placement of professionals for the financial services industry. Compl. ¶¶ 5-6. Prior to starting Sasqua, Tors had worked for 15 years at Goldman Sachs as a precious metals and foreign currency trader, six years at AIG heading up currency sales, and two years at UBS where he was in charge of foreign exchange sales to corporations. *Id*., ¶ 15. Sasqua works with a small group of high-caliber clients, including businesses such as Barclays Capital, The Royal Bank of Scotland, Nomura America Holding, Inc., Standard Chartered Bank, BNP Paribas and others. Lehman Brothers was one of Sasqua's major clients until it closed in 2008. *Id*., ¶ 9.

Up until mid-January 2010, Sasqua employed five individuals aside from Tors. Sasqua's personnel consisted of Defendant and Managing Director Lori Courtney, Vice-President Bridget Schulten, Senior Associate Debora Doerr Larsen, Research Consultant Kathleen Kelly and a computer technical expert, Douglas Steinschneider. These individuals were hired on an "independent consultancy basis under contracts that were renewable annually." *Id*.

Courtney is a New York resident who started working at Sasqua in 2000 as a consultant. As Managing Director, Courtney ran the day-to-day business of Sasqua and the other "consultants" served as Sasqua's recruitment staff. *Id*., ¶ 10. At Tors' direction, Courtney

2

formed Artemis Consulting LLC in New York in or before 2003 to serve as a vehicle to receive compensation from Sasqua. *See* Declaration of Christopher G. Tors in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ("Tors Decl."), ¶ 10. In 2007, Courtney converted the LLC into defendant Artemis Consulting Inc. ("Artemis"), a New York corporation which continued to receive Courtney's compensation from Sasqua. *Id*.

Plaintiffs assert that Tors hired Courtney in September 2000 as an entry-level research consultant for Sasqua. She was paid an hourly fee with bonus opportunities for successful placement of candidates. According to the Complaint, Courtney had no experience in the recruitment and placement of financial industry professionals prior to joining Sasqua. *Id*., ¶ 12. Tors claims that he trained Courtney and taught her every aspect of the business, including passing on many of his business contacts and relationships. *Id*., ¶ 13. Courtney asserts that Tors had only 2 ½ years of experience in the industry when she started to work for him. *See* Declaration of Lori Courtney in Opposition to Plaintiffs' Motion for a TRO and Preliminary Injunction ("Courtney Decl."), ¶ 16. Prior to commencing work for Sasqua, Courtney had 11 years of experience in the financial industry and in sales and marketing work for a publishing company. *Id*., ¶ 17.

In 2008, Tors and Courtney entered into negotiations to form a partnership agreement. For a variety of reasons, these negotiations fell through and Courtney continued to work for Sasqua under consulting agreements negotiated annually. Compl., ¶ 22. Beginning in January 2009, Tors and Courtney started sharing equally in the profits, expenses and losses of the business. *Id*. Under the terms of the 2009 contract, it was agreed that anyone who originated or executed a placement was able to earn additional bonus amounts. *Id*., ¶ 24. Sasqua's business

was suffering from the decline in the economy at the beginning of 2009, particularly in the financial sector following the Lehman failure and AIG bailout. *Id.*, ¶ 25. In light of these circumstances, Tors and Courtney agreed at the beginning of 2009 that neither of them would take it distribution from the profits until the financial condition of the company improved. Sasqua's financial condition did improve in mid–2009 and during that summer, Sasqua repaid the loans that Tors and Courtney had paid to it and they were both able to start drawing profits again on a monthly basis. *Id.*, ¶ 28.

According to the Complaint, Sasqua maintains on its server a central database of client information that includes client contact information, individual profiles, contact hiring preferences, employment backgrounds, descriptions of previous interactions with clients, resumes and other information. This information was placed in the database over the years by Tors, Courtney, and the recruiters whenever they interacted with a client. *Id.*, ¶ 30. Sasqua employs a computer technician to maintain the database. *Id.*, ¶ 31. Plaintiffs assert that the database and the information it contains are highly confidential to Sasqua and only Sasqua personnel have access to it. *Id.*, ¶ 35.

On January 13, 2010, Tors and Courtney were both in Stamford, Connecticut for client meetings. Courtney requested a meeting with Tors at that time. Id., ¶ 38. During the meeting, Courtney advised Tors that she was terminating her relationship with Sasqua and planned to start her own executive search consulting firm in New York. *Id.*, ¶ 39. According to the Complaint, Tors was taken by surprise and had no prior indication that Courtney contemplated leaving Sasqua or that she was planning to start a competing business. *Id.*, ¶ 40. Concluding that there was little he could do, Tors negotiated the terms of Courtney's departure. Tors and Courtney

agreed that the remaining engagements on which Sasqua's recruitment personnel were currently

working would continue as usual until the engagements were closed out. At that point,

Courtney's association with Sasqua would end and Sasqua would distribute to Courtney the

amounts she had earned from those engagements, as provided in the 2009 contract. *Id.*, ¶ 41.

The company's computer technician removed Courtney's access to the database and erased the

copy of the database from Courtney's computer. *Id.*, ¶ 43.

Within the week following Courtney's resignation, Sasqua's three recruitment consultants

approached Tors and advised him that they were terminating their employment with Sasqua.

They further stated that they were going to work for Courtney and Artemis. *Id.*, ¶ 44. Tors

began immediate negotiations with Schulten, Larsen and Kelly to keep them at Sasqua. He was

unsuccessful with Larsen and Kelly but was still negotiating with Schulten. *Id.*, ¶ 46. When

Tors began contacting Sasqua clients to inform them that there would be a change in Sasqua's

business going forward, one of the clients, Standard Chartered Bank, informed Tors that he

already knew about the changes. Tors states that he understood this to mean that Courtney had

contacted Standard Chartered Bank and discussed her new business, in competition with Sasqua.

*Id.*, ¶ 47. This litigation followed.

## II.    THE PARTIES' CONTENTIONS

In the Complaint, Plaintiffs assert that their trade secrets encompass "the confidential

proprietary and competitively sensitive information about Sasqua's client contacts, their

individual profiles, their hiring preferences, their employment backgrounds, and descriptions of

previous interactions with client contacts." Compl., ¶ 58. Sasqua maintained all of this

information in a central database.  Tors Decl., ¶ 26.  The company had hired a computer

technician to maintain the database.  *Id*., ¶ 27.

According to the Plaintiffs,

32.   The information in the database is the lifeblood of Sasqua's business.  The
      database records and reflects the company's ten years of contact-and-
      relationship-building, which relationship-building is how Sasqua generates
      business.

33.   Such information is not available from a public source and it is not information
      that could be easily duplicated.

Compl., ¶¶ 32, 33; Tors Decl., ¶¶ 28, 29.

Tors states that the amount of time and resources Sasqua has expended in developing the

database cannot be calculated and the information contained in it is highly confidential, available

only to Sasqua's personnel.  Tors Decl., ¶¶ 30, 31.  Tors believes that since Courtney's

resignation from Sasqua, she has contacted Sasqua clients in order to solicit business.  He also

asserts that Courtney is "poaching all of Sasqua's recruiters," thereby debilitating Sasqua," and

that there is "real and substantial risk that, if no immediate intervention occurs . . . Courtney and

Artemis will use Sasqua's own former consultants and its confidential business information to

put Sasqua out of business."  *Id*., ¶¶ 57, 58.

In opposition, Defendant Courtney states that she has not misappropriated, nor conspired

with anyone to misappropriate, "any trade secret or confidential proprietary information

belonging to Sasqua, nor have I used such information since severing my relationship with

Plaintiffs."  *See* Courtney Decl., ¶ 2.  Courtney adds that she is not subject to any restrictive

covenants, but nevertheless has not "solicited any entity or person whose relationship with

Plaintiffs was originated by Tors" and has not "solicited any of Sasqua's independent contractors to come work for me." *Id*., ¶ 3.

Noting that recruitment of professionals for the financial services industry is a highly competitive field, Courtney maintains that "Sasqua and other such companies do not utilize any particular or proprietary methodology to perform a search." *Id*., ¶ 8. She further states that "virtually all personnel in the capital markets industry that Sasqua serves have their contact information on Bloomberg, LinkedIn, Facebook or other publicly available databases." *Id*. According to Courtney, the people who make up the financial services industry workforce, "including the Decision-Makers and other high level executives, typically change employers frequently . . ." and so "the contact information that a search firm may assemble in a database is almost immediately obsolete." *Id*., ¶ 10.

Courtney states that she informed Tors at the meeting on January 13, 2010 that she would no longer serve as a Sasqua consultant. She agreed that every deal initiated prior to that date was attributed to Sasqua and she would close the assignments for Sasqua so that Sasqua could bill them and then pay her compensation for initiating and closing the deal. *Id*., ¶ 53. During the meeting with Tors that day, Courtney states Tors agreed that her relationships were hers to take with her and he wished her luck. *Id.*, ¶ 56. Although she asserts that Tors invited her to copy her contacts from the Sasqua database, Courtney recalls that she declined the invitation, explaining to Tors that she really "didn't need to do any copying because of the accessibility of information from Bloomberg or other public databases." *Id*., ¶¶ 61, 62. According to Courtney, Sasqua's computer technician removed the database from her computer promptly. Moreover, Courtney contends that the database software used by Sasqua was out of

date and the program was not geared to the industry. She has purchased new software "designed for recruiters" and she is "building [her] own database from scratch in terms of the methodology and the data." *Id.*, ¶¶ 64, 65. Courtney maintains that she has not appropriated any trade secrets from Sasqua and that the information Tors seeks to protect is of very little value and is in no way proprietary to any search firm. *Id.*, ¶ 67.

## III.   APPLICABLE STANDARD

"A trade secret is 'any formula, pattern, device or compilation of information which is used in one's business and which gives [the owner an opportunity to obtain an advantage over competitors who do not know or use it.' New York courts consider several factors in determining whether information constitutes a trade secret, including (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Unisource Worldwide, Inc. v. Valenti*, 196 F.Supp.2d 269, 278 (quoting *Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.,* 118 F.3d 955, 968 (2d Cir. 1997) (applying New York law)). These factors were first enumerated in *Ashland Management, Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912 (1993) (quoting Restatement of Torts § 757, cmt. b).

"'A customer list developed by a business through substantial effort and kept in confidence may be treated and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable.' In

addition, knowledge of a customer's needs and specifications and the prices charged to that customer are considered confidential." *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 278 (quoting *Defiance Button Mach. Co. v. C & C Metal Products. Corp.,* 759 F.2d 1053, 1063 (2d Cir.), *cert. denied,* 474 U.S. 844 (1985)).   Therefore, "[a] plaintiff claiming misappropriation of a trade secret must prove: '(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'"  *Computer Associates International, Inc. v. Bryan*, 784 F. Supp. 982, 987 (E.D.N.Y. 1992) (citing *Integrated Cash Mgt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990))

It is clear that irreparable harm is presumed where a trade secret has been misappropriated.  In the words of the Second Circuit, "[a] trade secret once lost is, of course, lost forever" and, as a result , and as a result, such a loss "cannot be measured in money damages." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) ("the loss of a trade secret is not measurable in terms of money damages"); *Computer Assocs. Int'l v. Bryan*, 784 F. Supp. 982, 986 (E.D.N.Y. 1992) (for purposes of a motion for a preliminary injunction, loss of trade secrets is not measurable in terms of money damages and is thus considered irreparable harm).  *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 628 (E.D.N.Y. 1996).

## IV.   DISCUSSION

### A.   Nature of the Information Sought to be Protected

It is worth noting at the outset that there is no restrictive covenant between the parties

here which might otherwise govern this dispute.[1]  *Compare*, *BDO Seidman v. Hirschberg*, 93

N.Y.2d 382, 388-89 (N.Y. 1999); *Silipos, Inc. v. Bickel*, No. 1:06-cv-02205, 2006 WL 2265055,

at *3 (S.D.N.Y.  Aug. 8, 2006) (if an employer can demonstrate at least one legitimate interest,

such as protection of trade secrets, a court has discretion to partially enforce an otherwise

overbroad covenant).   Plaintiffs maintain that Defendants have misappropriated Sasqua's trade

secrets.  Pls.' Mem. at 12.   To qualify for protection against such alleged misappropriation,

Plaintiffs must demonstrate (1) "that [Sasqua] possessed a trade secret and (2) that the

Defendants used that trade secret in breach of an agreement, confidential relationship or duty, or

as a result of discovery by improper means." *North Atlantic Instruments v. Haber*, 188 F.3d 38,

43-44 (2d Cir. 1999).   Therefore, the threshold question which needs to be determined is

whether the client database maintained by Sasqua is entitled to trade secret protection at this

stage of the litigation.  *See Kadant, Inc. v. Seeley Machine, Inc.*, 244 F. Supp.2d 19, 35

(N.D.N.Y.  2003).  "The question of whether a customer list is a trade secret is generally a

question of fact."  *Id*. at 36 (citing *North Atlantic Instruments,* 188 F.3d at 44).  To analyze the

---

[1]     Defendant Courtney's 2008 contract with Sasqua did contain certain restrictive
covenants. However, when Courtney and Tors entered into an agreement for 2009, they mutually
agreed that neither of them would be held to any non-compete or other restriction, and, thus, the
2009 agreement contained no restrictive covenants.  Courtney Decl. ¶ 38; Defendants' Mem. at 7.
Plaintiffs have not refuted this assertion.  In fact, as part of the 2009 agreement, Courtney put up
$40,000 to help pay the consultants and other expenses. Courtney stated, and Tors has not
refuted, that the outlook for Sasqua was so bleak that Tors did not offer contracts for 2009 to the
consultants at Sasqua.  Courtney Decl. ¶¶ 39-40; Defendants' Mem. at 7.

alleged "trade secret" information presented here in the absence of a restrictive covenant, then, the Court now turns to an assessment of each of the *Ashland Management* factors as applied to the specific circumstances of this case.

### 1. Is the Information Known Outside the Business?

As Plaintiffs have noted, under Second Circuit precedent, "[a] customer list 'developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor,  provided the information it contains is not otherwise readily ascertainable.'" *North Atlantic Instruments*, 188 F.3d at 44 (quoting *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir.), cert. denied, 474 U.S. 844 (1985)).   This is indeed the nub of the arguments presented by both sides in the instant case.  Plaintiffs claim that Defendants possess Sasqua's confidential business information, including its client list and contacts, its list of recruitment candidates, its business strategies, its search and placement methods, its fee structures and other information.  Tors Decl., ¶ 52; Pls.' Mem. at 9.  According to the Plaintiffs, the information contained in the Sasqua database is not available from a public source.  Tors Decl., ¶ 29; Pls.' Mem. at 6.  Over the past 10 years, Sasqua has compiled "detailed contact information for Sasqua's clients," Tors Decl., ¶ 53, as well as confidential information concerning each client's needs, preferences, hiring practices, strategies for business expansion, and personal knowledge as well as acquaintance with key decision-makers at the client firms.  *Id*., ¶¶ 53-54.  Plaintiffs argue that Sasqua has invested tremendous time, energy and resources into developing the contacts and relationships that are now threatened by the Defendants and that the confidential information was not known outside Sasqua until Defendant Courtney departed.  *Id*., ¶ 55; Pls.' Mem. at 10.

11

On the other hand, Defendants maintain that Sasqua and other such companies "do not utilize any particular or proprietary methodology to perform a search. The stock tool of the trade is the Internet, where information regarding prospective financial institution customers, as well as job candidates, is equally and readily available to any recruiter." Defs.' Mem. at 2-3. The Defendants go on to note that "virtually all capital markets personnel have their contact information on Bloomberg, LinkedIn, Facebook or other publicly available databases, including a firm's own media advertising." *Id.*

Plaintiffs rely primarily on *North Atlantic Instruments* and *Webcraft Technologies, Inc. v. McCaw*, 675 F.Supp. 1039, 1044 (S.D.N.Y. 1987) to support their position that Sasqua's client list, contact persons, preferences, operations and hiring practices are subject to trade secret protection. These two cases, however, dealt with different products and services than what is at issue in the current action and are factually distinguishable. In *North Atlantic Instruments*, plaintiff North Atlantic had entered into an Asset Purchase Agreement with Transmagnetics, Inc. ("TMI"), which was engaged in a related business targeted toward a particular niche market. TMI designed, manufactured and sold customized electronic devices to a limited number of engineers in the aerospace and high-tech industries. *North Atlantic Instruments*, 188 F.3d at 40. North Atlantic's CEO testified that the customized nature of TMI's business "made the identity of the relatively small number of engineers who require its products especially crucial to its business success." *Id.* Consequently, knowing the identity and needs of these engineers was an extremely valuable aspect of TMI's business and one which would have been difficult for another company to ascertain on its own. *Id.* TMI's president, Fred Haber, was also TMI's head of sales. North Atlantic conditioned its purchase of TMI on Haber's continuing to work for

North Atlantic in a role similar to the one he occupied at TMI and for which North Atlantic paid him a salary and bonuses. *Id*. at 40-41.

Some three years later, after Haber had access to information about North Atlantic's technology and customer base, including lists of customers and contacts with their individual product needs, Haber left North Atlantic and joined a competing company. That company hired Haber specifically because of the contacts he developed at TMI/North Atlantic. At a hearing on North Atlantic's motion for a preliminary injunction, North Atlantic produced a printout of confidential client information from its customer database. That list had been printed by Haber over a month *after* he had left North Atlantic and it was found in the new company's files. *Id*. at 42. In his Report and Recommendation, the magistrate judge found that the list of companies to whom North Atlantic's TMI division sold was not a trade secret; however, the magistrate judge concluded that the identity of the individual contact people with whom Haber dealt while at North Atlantic/TMI was a protectable trade secret. *Id*. at 44-45. In making that determination, the magistrate judge relied on the testimony of North Atlantic's chief executive who described the "needle-in-the-haystack character of the search for the handful of engineers in companies of 100,000 employees who might have a use for one of North Atlantic's customized products." *Id*. at 45. That is clearly not the scenario with regard to Sasqua's clients.

Similarly, in *Webcraft Technologies*, the plaintiff sold unusual custom printed materials, as distinguished from services, that were produced by an "in-line finishing" process. *Webcraft Technologies*, 674 F.Supp. at 1041, 1045. There, the defendant had signed an employment agreement containing covenants which prohibited her from competing with Webcraft or soliciting Webcraft customers for a period of two years from the date of termination of her

employment. The covenant also prohibited plaintiff from disclosing any trade secrets relating to Webcraft's business – specifically, names and needs of customers, pricing information and certain designated specifications and lists. A competing company offered the defendant a job, which she accepted, but she remained at Webcraft for three additional weeks. During that period, she passed confidential Webcraft information on to her next employer. *Id*. The defendant gave her new boss a list of Webcraft customers and viable prospects. In addition, she removed certain property from the Webcraft office. *Id*. at 1042. Among these items were defendant's Webcraft rolodex and eight pages of Webcraft quotes and pricing sheets for three possible jobs the defendant was pursuing while at Webcraft, along with a statement of Webcraft's commission plan. *Id*. The court held that the defendant violated both the letter and spirit of the trade secrets provision by blatantly passing to the competitor company Webcraft's customer information, project specifications and pricing details. *Id*. Moreover, Webcraft introduced evidence of the long and difficult process to educate and convert a prospective customer to the benefits of the in-line finishing process. Defendant herself testified that developing a customer in that business was an "arduous" process. *Id*. The evidence also established that the specialized nature of Webcraft's business "was not useful to many people, many kinds of advertising or direct mail customers." *Id*.

Plaintiffs' reliance on *Giffords Oil Co, Inc. v. Wild,* 106 A.D.2d 610, 483 N.Y.S.2d 104 (2d Dep't 1984) is also unavailing. Like the defendant in *Webcraft*, defendant Michael Wild was subject to an employment agreement containing a restrictive covenant which prevented him from soliciting customers for three years after termination of his employment. *Id*. at 610. The Appellate Division held that the customer list at issue in *Giffords Oil* was entitled to trade secret

protection because the list also contained information such as the fuel oil capacity of each customer's tank and the amount certain customers were willing to pay – – information which could only be obtained through personal solicitation. *Id*. at 611. In the instant action, aside from the absence of a retrictive covenant, Plaintiffs allege that Defendants possess Sasqua's fee structure but produced no evidence at the hearing demonstrating that Defendant Courtney was using any Sasqua pricing information or customer specifications. Moreover, from the information presented thus far, it appears that each placement Sasqua makes is unique. As such, there is little, if any, competitive advantage to be gained from knowledge of Sasqua's pricing since there is no exact formula for pricing that Courtney could use to her advantage. *See Production Resource Group, L.L.C. v. Oberman*, No. 03 Civ. 5366, 2003 WL 22350939, at *14 (S.D.N.Y., Aug. 27, 2003).

Here, the circumstances involving Defendant Courtney's relationship with and departure from Sasqua are quite different. For example, there was no non-compete or non-solicitation agreement in place which bound Courtney in any way at the time of her departure from Sasqua. In addition, the evidence adduced at the hearing established that Courtney did not take the Sasqua database with her. In addition to Courtney's own testimony, the Declaration of Douglas Steinschneider, Sasqua's computer technician, submitted in opposition to Plaintiffs' motion for a TRO and preliminary injunction ("Steinschneider Decl."), sets forth that Tors originally told Steinschneider to remove the database from Courtney's computer at the time she announced she was leaving Sasqua and would be competing with Sasqua through her own company, Artemis. Steinschneider Decl. ¶ 8. After Steinschneider removed the database, Tors changed his mind and told Steinschneider he wanted Courtney to be able to access the database since Courtney had

agreed to complete searches for Sasqua that she had already begun. At that point, Steinschneider told Tors that he had already removed the database and that Courtney said she did not want it. On that basis, Steinschneider did not reinstall the database. *Id*.; Courtney Decl., ¶ 64.

Significantly, Courtney did not sign on to work for a competitor; rather, she went into business for herself. She is not selling a unique product to a few industry insiders, nor is she educating customers to an unusual manufacturing process as did the defendants in *North Atlantic Instruments* and *Webcraft*. By contrast, any firm or entity in the financial services industry with a managerial or executive position vacancy is a potential customer of a business such as Courtney's which offers executive placement services. The "product" here is not one "where a company's availability as a potential patron cannot be readily ascertained. The potential list of [plaintiffs'] customers is not limited in such a way that any list of . . . prior purchasers is a trade secret." *Iron Mountain Info. Mgt., Inc. v. Taddeo*, 455 F.Supp.2d 124, 139 (E.D.N.Y. 2006).

Courtney testified during the hearing that the identity of capital markets businesses is readily ascertainable through an Internet search, in the phonebook, in trade publications or through a firm's own media advertising. Transcript of the February 11, 2010 Hearing, at 28.[2] The predominant business model that Sasqua followed was to get a search assignment from a capital markets business and then go out and find a candidate to fill that assignment. *Id*. at 31-32. Courtney's specialty was foreign exchange trading, foreign exchange businesses and emerging markets. In the foreign exchange area, Courtney testified that she could obtain the names of the global head of foreign exchange businesses, the sales and trading head, the regional

---

[2]       All subsequent references to the record of the February 11, 2010 hearing are designated "Tr. at ___."

heads, and specific traders from sources such as Bloomberg, LinkedIn, Facebook and general Google searches. *Id.* at 37. She added that many people who are found in Bloomberg have their titles or specialties listed, along with a substantial amount of background information, including their resumes or, at the very least, their past work history, education, personal cell phone number, e-mail address and often the very desk they work on in the foreign exchange business, as well as a listing of their responsibilities. *Id.* at 39.

Courtney further described how she would track down information at a capital markets business. Specifically, she would start with an Internet search and look for high turnover at banks. Having obtained that information, she would then do a search on Bloomberg, LinkedIn or Google. Once she had gained as much knowledge as possible regarding the bank or business, she would then call the potential decision-maker, explain that she is a recruiter and has knowledge of that contacted person's business and the kinds of things that the business might need. *Id.* at 40-41. The goal would be to set up a meeting or phone call and try to gain the contact person's confidence. During the course of his examination of Courtney, in an attempt to show that the foregoing scenario was not the actual manner in which Sasqua drilled down for information regarding specific decision-makers, Plaintiffs' counsel asked a series of questions related specifically to the foreign exchange business at Lehman Brothers. Prior to the economic downturn in the Fall of 2008, Lehman Brothers accounted for two-thirds of Sasqua's business. *Id.* at 47. Plaintiffs' counsel elicited testimony from Courtney establishing that Tors' business card was originally passed down at least four levels from a high ranking senior executive at Lehman Brothers to the head of foreign exchange who was the one responsible for utilizing recruiters for searches in that area. Courtney acknowledged that Sasqua did not obtain foreign

exchange searches by cold calling the high ranking senior executive. *Id*. at 64-68. Her job was to get to know the appropriate decision-maker and cultivate a relationship with him or her. In addition to Lehman Brothers, Courtney worked with Barclay's, Nomura and Standard Chartered Bank. *Id*. at 72. When plaintiffs' counsel asked "And whether or not you have access to Sasqua's database, you know how to be in touch with [the decision-makers]," Courtney answered "yes, that's true." Tr. at 73.

With regard to the database used at Sasqua, Courtney testified that it "served the purpose of a rolodex, keeping people's names and phone numbers and then there was some minimal qualification-type stuff, you know, very basic." *Id*. at 91. The software was very old according to Courtney, so the search capability was limited to one descriptive item. *Id*. at 92. The database contained an individual name with a code attached to the name. As an example, Courtney testified that an individual's name would appear with a code such as "FX senior management" ("FX" meaning foreign exchange) or something like that. *Id*. at 93. Sasqua recruiters could only attach one designation to a name. *Id*. These assertions are supported by the Steinschneider Declaration in which Sasqua's computer technician states that "the information on the database was exceedingly old and stale, much of it was never even accessed let alone used, and overall was of little value." Steinschneider Decl., ¶ 1(d).

In applying the *Ashland Management* factors, the Court needs to consider "whether the effort invested in developing the customers simply involved widespread canvassing, as was the case in *Leo Silfen*, or whether the employer actually worked to create a market for a new service or good." *Webcraft Technologies*, 674 F. Supp. at 1045 (referencing *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 427-29 (N.Y. 1972)). The service at issue here, executive

recruitment and placement, sometimes referred to as "headhunting," is not one that is "so specialized that [Sasqua] actually created a new market; rather, the list of potential customers appears limitless." *Iron Mountain*, 458 F. Supp.2d 124, 140 (E.D.N.Y. 2006). Put succinctly, the list of customer contact information was developed largely through the efforts of Courtney both before and during her employment with Sasqua, in a market that "is not so highly specialized but has many, easily identifiable, potential customers." *Id.*; *see Reed Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 308, 353 N.E.2d 590, 594, 386 N.Y.S.2d 677, 680 (1976) (where former employee's past or prospective customer names can be readily ascertained from sources outside its business, trade secret protection will not attach).

Courtney also admitted that since leaving Sasqua on January 13, 2010, she has talked to many of the same business contacts that she spoke with when she worked for Sasqua and she did seek new search assignments. Tr. at 79. However, she testified that she never had a conversation prior to leaving Sasqua with any Sasqua clients about getting future work from them for her own company, Artemis. Tr. at 83. Courtney spoke with contacts at Nomura after leaving Sasqua while she was continuing to conclude a search for them as part of Sasqua's business. In those conversations, she advised the individuals that she was on her own and that she hoped to get more business from them going forward. *Id*. at 88. According to Courtney, Tors told her at the January meeting that her relationships were hers to keep and that he did not expect her to refrain from contacting them because there was no non-compete in place. *Id*. She has refrained from contacting any of Tors' relationships, including Interactive Brokers, Hess and Sempra. *Id*. at 88-89. As to Nomura, Courtney has communicated with six to eight contacts, including by e-mail.

Those e-mail addresses are in her personal Microsoft Outlook as well as in the Outlook folders for her new company. *Id*. at 89.

Defendants do not dispute the standard enunciated in *North Atlantic Instruments* for establishing a trade secret claim or claim for misappropriation. *See* Defendants' Mem. at 12. Rather, drawing upon the argument that whether a customer list is a trade secret is generally a question of fact, defendants maintain that there are "readily apparent factual dissimilarities" between the information at issue in this case and customer lists that the courts have found to be trade secrets. *Id*. at 13. Defendants rely on the Second Circuit's recent decision in *Faiveley v. Transport Malmo AB v. Wabtec Corp*., 559 F.3d 110 (2d Cir. 2009), in which the court clarified its prior holdings regarding misappropriation of trade secrets. In *Faiveley*, the trial court had granted a preliminary injunction to the plaintiff, finding that the defendant had likely misappropriated certain of plaintiff's trade secrets involving the manufacture of an air brake system for the New York City subway. The court enjoined the defendant from entering into contracts that would cause it to use those trade secrets. *Id*. at 115. On appeal, the Second Circuit addressed its prior holdings regarding the misappropriation of trade secrets and determined that the injunction was not warranted. Specifically, the court provided the following guidance:

> we have previously observed that "the loss of trade secrets cannot be measured in money damages" where that secret, once lost, is "lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co*., 730 F.2d 61, 63 (2d Cir. 1984) (per curiam). Some courts in this Circuit have read this passing observation to mean that a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated. *See, e.g., Ivy Mar Co. v. C.R. Seasons, Ltd*., 907 F. Supp. 547, 567 (E.D.N.Y. 1995) ("[I]rreparable harm is presumed where a trade secret has been misappropriated."). That reading is not correct. A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise

irreparably impair the value of those secrets.  Where a misappropriator seeks only to use those secrets - - without further dissemination or irreparable impairment of value - - in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury.  Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.  As Judge Conner has observed, where there is no danger that a misappropriator will disseminate proprietary information, "the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages."  *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 966 (S.D.N.Y. 1996).

*Id*. at 118-119.  The Second Circuit has therefore drawn a distinction here  - -  one that is important to the instant case - - between an individual who *uses* a trade secret and an individual who *disseminates* a trade secret.  In the current action, even crediting Sasqua's claims to the fullest extent, the information presented shows that, at best, defendant Courtney was a user of the information and not someone who was disseminating the information.  In fact, dissemination is not even alleged by the Plaintiffs.  As the court in *Faiveley* noted, the defendant [Courtney] would have the same incentive as the plaintiff [Tors] to maintain the confidentiality of the information in order to profit from such knowledge.  *Id*. at 119.

During the hearing, to support Defendants' contention that the information in Sasqua's database is not a trade secret and is readily ascertainable, Defendants' counsel had Courtney walk through the manner in which she would conduct a search "if she had amnesia tomorrow, lost her Blackberry" and "needed to identify . . . the decision-makers in the industry. . . ."  Tr. at 113.  Courtney then testified how she would go about finding these people from publicly available information.  Defendants' introduced Exhibit 1 ("DX 1"), a copy of which is attached to this Report and Recommendation.  *Id*.

Courtney testified that if she had only basic knowledge of what a capital markets business is and was starting from scratch to find information on key decision-makers, she would start with an Internet search. With an understanding that many banks are hiring personnel in emerging markets, Courtney stated that she would begin by seeking an emerging markets salesperson or decision-maker whom she could contact at Standard Chartered Bank. Tr. at 114. Courtney described a publication, *FX Week,* which carries substantial information about foreign exchange businesses and also touches on emerging markets. *FX Week* has a searchable database, so she would type into the search window the terms "emerging markets sales" and "Standard Chartered Bank" ([www.fxweek.com/search?query=emerging](http://www.fxweek.com/search?query=emerging)+market +sales+Standard CharteredBank). The database brings up a list of topics and articles which the searcher can click onto, as shown on DX 1 at 1. One of the articles listed is entitled "StanChart in US build-up." *Id*. By clicking on that article, the computer displays the story on the monitor as reflected in DX 1 at 2. Courtney pointed out information in the article which stated that Standard Chartered Bank ("SCB") had made 17 new appointments and was looking to become a core bank for US-based clients. Tr. at 115. The names of the 17 appointees are listed in the article, the first of whom is Harvey Black, who heads SCB's investor sales business for the Americas. Black is clearly a decision-maker whom Courtney stated she would want to contact. *Id*.; DX 1 at 2. Courtney testified that the process of obtaining Black's name through this type of search took approximately 5 minutes. Tr. at 115-116.

The next name appearing in the article is Hugo Faria, who recently left UBS to join SCB as the head of its emerging markets structuring for the Americas. Tr. at 116; DX 1 at 2. This is another decision-maker. In addition to contact information for Mr. Faria, this data also provides

"another piece of intelligence," according to Courtney, because it would enable her during a call to UBS to offer assistance in finding a replacement. Tr. at 116. After getting these names, Courtney testified that there are several ways to obtain phone numbers. Here, she went to Google and entered the name "Standard Chartered Bank." That search yielded the address of the bank, the phone number and a map showing how to get there. Tr. at 117; DX 1 at 3. According to Courtney, her experience at Sasqua did not play a role in her ability to find this information on the Internet. Tr. at 17-118. What does assist her in obtaining this kind of information and building relationships with clients is her experience prior to joining Sasqua - - prior jobs as an equity derivatives trader on the options floor of the New York Stock Exchange, a commodity derivatives trader on the COMEX, and a marketer of commodity derivatives for Paribas, the French investment bank. According to Courtney, with such background, clients "trust that you understand their needs" which strengthens your credibility. Tr. at 118-119.

Courtney then described a similar process that she would utilize if she were approached by a foreign exchange trader who was looking for a position at Nomura and if she were starting from scratch. Going to Google first this time, Courtney typed in the phrase "global head of FX in Nomura." Tr. at 120. Approximately 72,400 hits came up, the first of which was entitled "Nomura Appoints Head of Fixed Income Research." Clicking on that entry yielded the name of the appointee, the date, and the prior position occupied by the appointee at his previous bank. DX 1 at 4. Further down the page was an entry entitled "Nomura Brings in Lehman FX Team." *Id*. Clicking on that entry brings the searcher to a website called "Profit&Loss.com" and a December 2009 article entitled "Nomura's Richard Gladwin: Global Ambition." DX 1 at 5. Richard Gladwin is listed as the global co-head of foreign exchange at Nomura and the article is

a six-page interview with him.  The interview provides significant detail concerning Nomura's

new technology and initiatives.  Gladwin discusses Nomura's acquisition of parts of Lehman

Brothers as an element of its strategy to "become a global wholesaler of foreign exchange."  *Id*.

Since Gladwin's phone number and contact information were not contained in the article,

Courtney next went to Bloomberg.com "because that is the database for financial professionals."

Tr. at 122.   Doing a search on Bloomberg, Courtney was able to find the direct phone number

for Gladwin at Nomura's offices in London, the London address itself and Gladwin's direct e-

mail address.  The Bloomberg site also allows the user to send an instant message to Gladwin.

Tr. at 122.

Courtney also explained how such a search could be conducted on LinkedIn, which she

described as being "like Facebook but for business" and as being more searchable than

Bloomberg "because people put their whole profile on LinkedIn."  Tr. at 123-124.  Using

LinkedIn, Courtney demonstrated the results of putting the term "FX Nomura" into the search

box. The first entry listed the name "Michael Wilson," Executive Director at Nomura; the second

entry listed the name "David Steck, FX at Nomura Securities."  DX 1 at 12.  After looking at

both profiles, Courtney determined that David Steck's listing yielded the information she was

seeking. Clicking on the "David Steck" entry brought up a screen which listed Steck's prior

employers and positions, current title, undergraduate school and dates of attendance, e-mail

address and Steck's interests.  DX 1 at 13; Tr. at 125-126.  Further researching Steck, Courtney

entered his name on Bloomberg.com and found a news story regarding Steck's hiring by Nomura

as well as "competitive intelligence" about Nomura's plans and other new hires.  DX 1 at 14.

With regard to the level of information, Courtney testified that

[i]t used to be years ago, that people were very protective about their resumes and personal information because no one ever wanted their employer to get wind that they were looking for another job. But in a post-Lehman bankruptcy world when everyone thought that the whole financial markets were going to the birds, and everyone was panicked about their jobs, the culture changed absolutely overnight to one where people were protective of their information to one where almost everyone . . . puts it out there for the world to see because people want to be connected now. People want to know - - people want the recruiters knowing who they are and how to find your information and how to find them if they have a good opportunity. It has completely shifted.

Tr. at 127.

Since the Bloomberg article did not provide contact information for David Steck, Courtney did a search on Google for Nomura New York, and came up with Steck's New York address, the office location in the World Financial Center, and the office phone number. Tr. at 128; DX 1 at 15. Using Bloomberg.com, Courtney was then able to obtain Steck's direct phone line and personal e-mail address. DX 1 at 16. Courtney demonstrated similar searches for information regarding decision-makers at the Royal Bank of Scotland ("RBS") and new senior-level hires at RBS. DX 1 at 17; Tr. at 129-131. Significantly, when Courtney came upon the name of Craig Donaldson, head of RBS' Financial Institutions Foreign Exchange and Prime Brokerage Sales for North America, she noted that Donaldson was responsible for expanding RBS' foreign exchange platform. Tr. at 130. She then went to LinkedIn and posted Donaldson's name in the search box. Donaldson's profile listed all of his prior employment and positions, his current position, education and dates, licenses held, and interests. DX 1 at 20-21. In addition, the profile listed his wife's name, his children's names and ages, the outdoor sports he enjoys, and his birthday. Within the time span of Courtney's testimony, the defendants produced evidence of the publicly available information regarding decision-makers in foreign exchange

firms and businesses that in most cases, according to Courtney, exceeded the amount and level of detail contained in the Sasqua database. Tr. at 132. Plaintiffs did not refute this testimony. Courtney also noted that much of the information in the Sasqua database was outdated and did not have any value to her. Tr. at 136.

On further questioning by plaintiffs' counsel, Courtney acknowledged that she did not utilize the methodology she had outlined in discussing DX 1 when contacting Sasqua clients after January 13, 2010. Tr. at 139-140. Plaintiffs' counsel argued that what the clients' preferences are and "finding the right decision maker and getting that right decision maker to act is not nearly as easy as [Defendant Courtney] is articulating when she walks through Exhibit 1." Tr. at 143. However, there was no controverting testimony proffered to support Plaintiffs' contention in this regard.

At the very least, Plaintiffs have failed to prove that the general contact information for Sasqua clients is not readily ascertainable through outside sources, such as the Internet or telephone books, or directories of firms in the financial services industry, like the ones demonstrated by the Defendants at the hearing. *Kadant, Inc*., 244 F.Supp.2d at 36. Plaintiffs go on to argue, however, that with respect to specific names of individuals who are key persons in the chain of command for authorizing placements and obtaining business at these firms, such information cannot be so readily ascertained. Tr. at 147, 149-150. Although Plaintiffs' counsel argued this point forcefully several times during the hearing, Plaintiffs nevertheless did not produce a single witness to provide sworn testimony supporting this contention or contradicting Courtney's testimony in this regard, other than by generalized statements in Tors' Declaration. Moreover, since the general contact information is readily ascertainable through other sources,

26

and may therefore readily be used, "follow-up questions to the company in general would reveal the specific names, e-mail addresses, or phone numbers of individuals involved in the [hiring/placement] process for those companies." *Kadant, Inc.*, 244 F.Supp.2d at 36 (citing *InFlight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 129 (E.D.N.Y. 1997)); *Ability Search, Inc. v. Lawson*, 556 F.Supp. 9, 16 (S.D.N.Y. 1981) (executive placement firm not entitled to injunction with respect to information about corporate clients "since it failed to prove that defendants utilize any information about such clients which was not available from public sources or readily ascertainable by defendants in conducting their own business"). If these referenced sources did not directly disclose the appropriate contacts, further inquiry with those firms and further research on the Internet certainly would. *InFlight Newspapers*, 990 F. Supp. at 129.

Plaintiffs also allege that the Sasqua database contains information on certain firms' placement preferences and histories. It is true that while contact information may be readily ascertainable through other sources, things such as client preferences or placement histories may not. *See North Atlantic Instruments*, 188 F. 3d at 46; *Inflight Newspapers*, 990 F. Supp. at 127. This assertion is nonetheless subject to the same logic presented above. The general contact information is readily available through other sources. Utilizing those sources to obtain general contact information, Courtney or others may simply have asked the clients about their preferences. *See Kadant, Inc.*, 244 F.Supp.2d at 37 (citing *Tactica Int'l., Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F. Supp.2d 586, 607 (S.D.N.Y. 2001)) (" Information concerning the preferences of [plaintiff's] customers could easily be recalled by [defendants], or obtained by contacting the customers directly"); *Innoviant Pharmacy, Inc. v. Morganstern*, 390 F.Supp.2d 179, 195

(N.D.N.Y. 2005) (where referral sources are readily ascertainable from publicly available sources including the Internet, Yellow Pages, and the membership lists of various professional organizations providing services in those areas, the customer information does not possess the attributes of a trade secret); *Walter Karl, Inc. v. Wood,* 137 A.D.2d 22, 27, 528 N.Y.S.2d 94, 98 (2d Dep't 1988) ("An employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential.").  Defendant Courtney has certainly alleged that this is how the process works.  "Mere 'knowledge of the intricacies of a [former employer's] business operation' does not constitute a protectable trade secret that would justify prohibiting the employee 'from utilizing his knowledge and talents in this area.'" *Int'l Paper Co. v. Suwyn*, 966 F.Supp. 246, 256 (S.D.N.Y. 1997) (quoting *Reed Roberts*, 386 N.Y.S.2d at 680). The burden is on the plaintiffs to provide sufficient proof that this is not what occurred.  *Id*. They have not done so.  As to this first *Ashland Management* factor, Defendants have adequately established that the information Plaintiffs contend is a trade secret was/is known outside Sasqua.

### 2.    *Extent of Employees' Knowledge*

There is no real dispute that the information in the Sasqua database was readily available to those working for Sasqua.  The company had purchased computers for Courtney and the three recruiters/consultants. Tors Decl., ¶ 32.   Tors states that Sasqua's entire personnel, including the recruiters, Courtney, Steinschneider and Tors himself, had access to the database because they required the information "in order to conduct their day-to-day business."  *Id*., ¶ 31.  According to Tors, Steinschneider downloaded a copy of the database to each of the computers and through a "secure connection," the consultants were able to "manually upload and download any new information that either they had entered into their respective copies of the database or that others

had updated the central database with." *Id.*, ¶¶ 33-34.  Tors further notes that he instructed each

consultant that she was the only one who was authorized to access the computer and that the

computer was to be used for work purposes only.  *Id.*, ¶ 35.  However, Tors did not require "that

employees sign confidentiality agreements, which cuts against a trade secret finding." *Freedom*

*Calls Foundation v. Bukstel*, No. 05CV5460, 2006 WL 845509, at *16 (E.D.N.Y. Mar. 3, 2006).

Nor did Sasqua limit the number of its employees who could access the information.  *Compare*

*B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05-CIV. 9988, 2006 WL 3302841, at * 3 (S.D.N.Y. Jan.

31, 2006) ("plaintiffs sufficiently protected their cost structures and bidding information as they

limit the number of employees that have access to such information").  All of Sasqua's

personnel, therefore, knew or had access to the information for which Plaintiffs seek to assign

trade secret protection because they utilized this information to do their daily work.  These facts

militate against a finding of trade secret protection as to this second factor.

### 3.  *Measures to Protect Secrecy of the Information*

As noted above, Plaintiffs assert that in order to protect the confidentiality of the

database, Sasqua purchased computers for Courtney and the three recruiters.  Tors Decl., ¶ 32.

The company's computer technician downloaded a copy of the database to each of the

computers.  Tors states that Sasqua purchased individual licenses to permit the consultants to use

certain software allowing access to the database.  *Id.*, ¶ 33.  There was no restriction on the

consultants manually uploading and downloading new information to and from the central

database.  *Id.*, ¶ 34.

Of all the *Ashland Management* factors, the most important consideration is whether the

information was kept secret.  *See Earthweb, Inc. v. Schlack*, 71 F. Supp.2d at 314 (citing *Lehman*

29

*v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986)); *Greenblatt v. Prescription Plan Services Corp.,* 783 F. Supp. 814, 826 (S.D.N.Y. 1992) (if owner of a trade secret fails to take reasonable precautions to protect the information, the information loses the protection of trade secret law). Whether Sasqua's information was kept secret is critical to the Court's determination of the trade secret issue.

The owner of a trade secret must take reasonable measures to protect its secrecy. *Defiance Button Machine Co. v. C & C Metal Products*, 759 F.2d 1053, 1063 (2d Cir. 1985); *EarthWeb, Inc.*, 71 F.Supp.2d at 314. Some of the measures courts have looked to in this regard are the use of passwords, alarm systems, and installation of firewalls and security software. *See, e.g.*, *Paz Systems, Inc. v. The Dakota Group Corp.*, 514 F. Supp.2d 402, 406 (E.D.N.Y. 2007) (employer's computer network was stored in a building protected by both commercial locks, passwords and an alarm system, including motion detectors); *Wrap- N-Pack, Inc. v. Eisenberg*, No. 04-cv-4887, 2007 WL 952069, at *9 (E.D.N.Y. Mar. 29, 2007) ( company implemented significant safeguards to protect information by requiring user identification and password; installing firewalls and security software that prevented salesmen from accessing any information regarding other salesmen's customers; installing passwords and restrictions of all laptop computers; circulating policy and procedure manual containing a code of conduct defining disclosure of confidential information as unacceptable behavior; pursuing litigation to prevent the threatened disclosure of confidential information); *B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 CIV. 9988, 2006 WL 3302841, at *4 (S.D.N.Y. Jan. 31, 2006) ("plaintiffs took appropriate measures, such as locking files and using computer passwords, to protect the contact information").

In support of their argument that plaintiffs did not implement reasonable measures to protect the secrecy of Sasqua's information, Defendants have provided the Declaration of Douglas Steinschneider, Sasqua's computer technician, who has worked for the company since its inception in 2000. *See* Declaration of Douglas Steinschneider In Opposition to Plaintiffs' Motion for a TRO and Preliminary Injunction ("Steinschneider Decl"), ¶1. Steinschneider tells a very different story from Plaintiff Tors regarding measures taken to protect the secrecy of Sasqua's database. According to Steinschneider, the Sasqua database was not initially constructed by Plaintiff Tors - - rather, Tors purportedly misappropriated the database from his prior employer, Futures International. *Id*.; Courtney Decl., ¶2. This is a significant point in the Court's consideration of whether trade secret protection should be afforded. Courts have looked to the method by which the data is acquired. As the court observed in *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100 (E.D.N.Y. 1991),

> In determining whether matter is protectable as a trade secret, courts frequently examine the method by which defendant acquired it, e.g., such as by stealing or copying . . . .

*Id*. at 1111. That same principle is applicable to Plaintiffs' acquisition of the database here. In light of the unrefuted allegation[3] that Tors took the database from his prior employer at the time of his departure, the issue arises whether Tors comes to this Court seeking equitable relief with unclean hands.

---

[3] Plaintiff Tors did not appear at the hearing. According to Plaintiffs' counsel, Tors was incapacitated based upon a fall the prior evening during which he broke his rib and spent the night in the hospital. Counsel noted that Tors had broken his ankle just two weeks earlier and required surgery which counsel believes may have led to the fall. Tr. at 5. However, no request for an adjournment of the hearing was made.

Further, Steinschneider goes on to note that

- Tors directed him to leave the database on Courtney's computer so Courtney could use it for searches she had agreed to complete *after* she left Sasqua. Steinschneider Decl., ¶ 1.

- Sasqua was "extremely lax in their efforts to safeguard the data." *Id*., ¶ 3.

- the Sasqua database was not password protected. *Id*., ¶ 4

- the database was "freely distributed to many people over the years, including temporary workers who had little longevity with the company." *Id*., ¶ 5.

- The database was not removed from an employee's computer after the employee left Sasqua and the individuals who left still have the database. *Id*., ¶ 6.

- the Sasqua database did not contain legends designating confidential and proprietary information embedded in its pages to remind employees of the confidential nature of the information or their duty to safeguard it. *Id*., ¶ 7.

According to Steinschneider, he removed the database from Courtney's computer as instructed initially by Tors. Subsequently, Tors changed his mind, but Steinschneider told Tors that he had already removed the database and Courtney said she did not want it, so Steinschneider did not reinstall it. *Id*., ¶ 8. With regard to the usefulness of the database, Steinschneider states that it was "exceedingly old and stale." *Id*., ¶ 9. In fact, because he was able to see whether data had been accessed and, if so, when that access had occurred, Steinschneider states that he was able to see that "a large part of the data was so useless that no Sasqua employee ever even accessed it, let alone used it." *Id*. Moreover, Steinschneider claims that "much of plaintiffs' database was more than 10 years old, because it was taken from Futures International and therefore was 10 years old before Sasqua ever got it in 2000." *Id*. Plaintiffs did not introduce any evidence at the hearing to contradict Steinschneider's sworn assertions. In

fact, Tors has made no statement denying the claim by Courtney and Steinschneider that he took the database utilized at Sasqua from Futures International.

Likewise, Courtney testified that there were people who never worked for Sasqua who were in possession of the database. Specifically, Courtney noted that a group in London called Edge Search with whom Sasqua was attempting to establish a joint venture possessed the database. Tr. at 94. In addition, a similar group, Bakiai International, partnered with Sasqua on a specific Lehman Canada search and Courtney testified that they had the database and may still have it because it was never taken back to the best of her knowledge. Moreover, Tors himself confirmed that from the time the New York office closed in 2008, the consultants have been working out of their own homes. Tors Decl., ¶8. Courtney notes that family members had access to the database by virtue of the fact that it was contained on the computers utilized by all of the consultants at home. Tr. at 94. It is also worth noting that when I asked Plaintiffs' counsel at the hearing whether the Sasqua computers were password protected, counsel's response was that she did not believe so. *Id*. at 16.

The evidence here shows that Sasqua failed to take even basic steps to protect the secrecy of the information contained in its database - - the very same information Tors refers to as "the lifeblood of Sasqua's business." Tors Decl., ¶ 28. Consequently, even if the database information may once have had protection, the customer information lost its character as a trade secret because Sasqua failed to take reasonable steps to protect the information from coming into other hands. *Defiance Button Machine Co.*, 759 F.2d at 1063 (even though competitor may have obtained customer lists by improper means, any such impropriety does not create liability for use of the trade secret since the failure to protect the list from ready access resulted in plaintiff

forfeiting the protections of trade secret law). This most critical of the *Ashland Management* factors, therefore, favors Defendants.

### 4. *Value of the Information to the Business and Its Competitors*

As to the value of the information contained in the Sasqua database, there is little doubt that the information as it was developed in the early years of Sasqua's history was essential to the business. However, Tors implies that because of his prior career at Goldman Sachs, AIG and UBS, his "very good industry connections" in the financial industry were responsible for Sasqua's success. Tors Decl., ¶ 5. According to Tors, Sasqua went from grossing several hundred thousand dollars of revenue annually to a multi-million dollar enterprise by 2010. *Id*. At the same time, however, Tors states that the only office which Sasqua maintained in New York closed as a cost-saving measure during the economic downturn in 2008. *Id*., ¶ 8. *See Dorazio v. Capitol Specialty Plastics, Inc*., No. CIV.A.01-6548, 2002 WL 31750215, at *4 (E.D. Pa. Dec. 9, 2002) (plaintiff failed to show that his contact with a substantial client was the but-for cause of the company's successes). Significantly, Courtney's compensation was based on commissions and an agreed-upon revenue share. Courtney Decl., ¶ 18. Courtney asserts, and Plaintiffs have not refuted, that she was responsible for 65% of the company's income in 2007. That number grew to 75% in 2008 and the remaining 25% was attributable to one placement that Tors initiated and Courtney executed. *Id*., ¶ 26. On the other hand, Tors did not make any placements that generated revenue for Sasqua in 2009. *Id*. Rather, Courtney's efforts and those of another consultant generated 87% and 13% respectively of the company's total revenue for 2009. *Id*.

In addition, both Steinschneider and Courtney have provided sworn statements that Tors took the information which became the Sasqua database from his prior employer, Futures International. Steinschneider Decl., ¶ 2; Courtney Decl., ¶ 2. Plaintiffs have not produced contrary testimony showing that the contacts were exclusively Tors in the first instance. Tors' Declaration leads to the conclusion that at least some of his client contacts were developed through his employment prior to establishing Sasqua. Tors Decl., ¶ 4. Based on this information, it is more difficult to view these client contacts as trade secrets belonging to Tors when he developed them while working for other employers. *See Ecolab*, 753 F.Supp. at 1111.

Further, Tors' assertion that the database is the "lifeblood of Sasqua's business" is belied by Steinschneider's sworn statement that the information on the database was "exceedingly old and stale, much of it was never even accessed let alone used, and overall was of little value." Steinschneider Decl., ¶ 1. According to Steinschneider, in the information technology field, data is generally considered stale if it is more than a year old. Similarly, Courtney maintains that

> 10.     Because the people who make up the financial industry workforce, including the Decision-Makers and other high level executives, typically change employers frequently, the contact information that a search firm may assemble in a database is almost immediately obsolete. Keeping tabs on Decision-Makers of potential job candidates is an ongoing part of a recruiter's job.
>
> 11.     . . . Even if the recruiter makes a record of the information collected for one assignment, that information generally is not that relevant to the next assignment. For example, one month a firm may be looking for a junior salesperson to cover hedge fund accounts, six months later the firm may need a director-level person to trade currency derivatives.

Courtney Decl., ¶¶ 10, 11. The database software used by Sasqua, in addition to being out of date, according to Courtney, is also not geared to the industry. *Id*., ¶ 65. She has purchased new

software designed for recruiters and is building her own database from scratch, both in terms of the methodology and data. *Id*. Courtney states that prior to 2008, only about 30% of Sasqua's information was current and that after the upheaval of 2008, only about 10% of the information was current. Id., ¶ 66. She noted that as soon as a candidate is placed, the candidate's resume, salary history and contact information are outdated. *Id*., ¶ 10. The Court finds there is some sense to this latter assertion and Plaintiffs have not presented any evidence refuting such contention. As a result, whatever value to Sasqua the database information once possessed clearly diminished over time as its utility to Sasqua's consultants declined, and, as a logical consequence, to any would-be competitor of Sasqua.

### 5.  *Time and Effort Expended in Developing the Information*

Although Sasqua has been in existence for ten years, the passage of time alone does not equate to "time and effort" in assessing this particular factor. This is not an instance where the client lists were gained through extraordinary effort or expensive research, although no one would dispute that Sasqua's personnel worked long and hard to make the company the success that it was. Yet, one does not have to look far and wide to determine the identity of firms operating in the financial services industry. These businesses regularly hire and terminate personnel and interact with headhunters while their employees often transition to new positions and new firms. *See In-Flight Newspapers, Inc*., 990 F. Supp. at 129. The identity of the firms and such individuals are not hidden.

As to Sasqua's existing accounts, Courtney acknowledged that for a long period of time, Lehman Brothers was a key client of Sasqua and that Tors originated that account. Both Tors and Courtney developed contacts at Lehman Brothers after Tors originated the account. Tr. at

47, 49.  Lehman Brothers accounted for two- thirds of Sasqua's business up until 2008.   The

financial market downturn in 2008 left Sasqua without its two biggest clients, Lehman Brothers

and Barclays.  Courtney Decl., ¶ 31.  Courtney testified that she made an effort to keep tabs on

the movements of people leaving Lehman Brothers and going other places in the Fall of 2008 and

thereafter.  She stated that many of these individuals readily sent her their new contact

information, and she placed that information into Sasqua's database.  Tr. at 54.

The instant circumstances are different from those set forth in *Freedom Calls*

*Foundation*, 2006 WL 845509 at * 16, where the court found that the plaintiff organization had

expended a great deal of resources in developing its network of supporters and clients, as

evidenced by the results.  There, the organization had to develop a reputation with both military

officials and families in order to acquire the video and tele-conferencing equipment, locations,

and participants needed for its activities.  *Id*.  Sasqua did not need such equipment and apparently

did not even need office space.  According to Courtney, each of the Sasqua

consultants/recruiters, like her, worked from home throughout their relationship with Sasqua.

Courtney Decl., ¶ 22.  The New York "office" was essentially what was known in the industry as

a "headquarters," where numerous companies "rent 'offices' on the same floor. . ."  *Id*.  Sasqua

rented its "office" jointly with another search firm for approximately a year or so and the office

"was visited by Sasqua's consultants only about a dozen times during that period, and primarily

for the purpose of interviewing job candidates."  *Id*.

Although Sasqua had periods of major success, the effort and research expended by

Sasqua personnel were part of their daily routine.  There was no elaborate computer system

compiling and analyzing data, there was no developed infrastructure, and for most of the time,

there was not even an office.  As Courtney noted, "recruiting is matchmaking."  Courtney Decl.,

¶ 6.  The recruiter's goal is to find and match an employer "needing an employee who has

particular expertise with the candidate who can fulfill that need."  *Id*.  The successful way to

acquire clients in such a business is by "establishing a personal reputation for diligent work

through personal relationships with hiring personnel."  *Id*., ¶ 7.  Repeat business is based upon

satisfied clients.  Tors himself has stated that "relationship-building is how Sasqua generates

business."  Tors Decl., ¶ 28.  Although the information in the database may assist the process, the

nature of the business focuses on the relationship built by the recruiter with the client and not

what elemental information is stored in a computer.  For the foregoing reasons, I find that this

factor is, at best, neutral in these circumstances.

### 6.     *Ease With Which the Information Could Be Properly Acquired or Duplicated*

The demonstration conducted by defendant Courtney at the hearing established that the

allegedly secret information from the Sasqua database could be properly acquired or duplicated

through a straightforward series of Internet searches in a drilling down exercise that likely could

be duplicated by a recruiter in  the executive search business for the financial services/foreign

exchange industry.  *See* Exhibit 1.  Although plaintiffs rely on *Freedom Calls Foundation*, 2006

WL 845509, that case is distinguishable.  There, the court found that it would be very difficult to

acquire or duplicate plaintiff' efforts in compiling its list of non-profit donors and clients

precisely because the personal contact information was *not* publicly available.  *Id*. at *53.  As to

Sasqua, it would not be too difficult for someone to duplicate the names of the clients in the

financial services industry with whom Sasqua did business by canvassing the market through

general research, Internet exploration and phone calls and then obtaining more detailed

information regarding the client's interests and preferences by subsequent research and further calls. *See Iron Mountain*, 455 F.Supp.2d at 140. This factor clearly favors the Defendants's position..

In sum, Plaintiffs have failed to prove a physical appropriation or copying of confidential information or wrongful disclosure or use of a trade secret. *See Leo Silfen*, 29 N.Y.2d at 389, 328 N.Y.S.2d at 424. The information in Sasqua's database concerning the needs of its clients, their preferences, hiring practices, and business strategies, as well as Sasqua's acquaintance with key decision-makers at those firms may well have been a protectable trade secret in the early years of Sasqua's existence when greater time, energy and resources may have been necessary to acquire the level of detailed information to build and retain the business relationships at issue here. However, for good or bad, the exponential proliferation of information made available through full-blown use of the Internet and the powerful tools it provides to access such information in 2010 is a very different story.

Having evaluated the information contained in Sasqua's database in the context of the *Ashland Management* factors as well as other applicable case law, I find that such information does not constitute a trade secret and I respectfully make that recommendation to Judge Spatt.

### B. Propriety of a Temporary Restraining Order

Because Plaintiffs have not demonstrated a likelihood of success on the merits with respect to the misappropriation of trade secrets claim, the Court need not address the issue of irreparable harm as to that claim. *See Iron Mountain*, 455 F.Supp.2d at 141. Notwithstanding the fact that Courtney did not take Sasqua's database with her when she left Sasqua - - a fact

supported by Sasqua's computer technician Steinschneider - - much of the hearing testimony established that the purportedly confidential and proprietary information was available through other sources in the industry. *See Int'l Paper Co.*, 966 F.Supp. at 258. Moreover, based upon Courtney's testimony and Steinschneider's Declaration, the Court concludes that much of the information that was available to Courtney at the time of her departure from Sasqua was stale and remains so. Here, the executive search/recruitment business, unlike some other highly technical industries, is a comparatively low-technology business and Courtney's work at Sasqua "was driven by general managerial expertise as opposed to the application of highly technical, proprietary, or secret information." *Int'l Paper*, 966 F. Supp. at 259. Even assuming that proprietary information existed at one time, I find no evidence supporting a conclusion that Courtney misappropriated such information. Accordingly, the level of risk that would justify the grant of injunctive relief with regard to Sasqua's database is simply not present at this time, and I respectfully recommend to Judge Spatt that no injunction be imposed.

The foregoing findings involve solely the claim asserted by Plaintiffs for misappropriation of trade secrets. This Court makes no findings as to the claims for unfair competition, breach of fiduciary duty or claims brought under the common law duty of loyalty to the employer. Likewise, although counsel for both sides spent time at the hearing going over issues related to the departure and alleged solicitation of the Sasqua recruiters as well as Tors' alleged alcoholism and its impact on the business, these issues are not germane to the determination of whether the Sasqua database constitutes a protectable trade secret and therefore such issues are not addressed here.

## V. CONCLUSION

For the reasons set forth in this Report and Recommendation, I respectfully recommend to Judge Spatt that (1) the information contained in Sasqua's database not be afforded trade secret protection and (2) no injunction issue here.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court via ECF. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Arthur D. Spatt, and to the chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Spatt prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir.), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED**

Dated: Central Islip, New York
       August 2, 2010

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge